STATE, Respondent v. WHITE HORSE, Appellant

(231 N.W.2d 847)

(File No. 11319. Opinion filed August 1, 1975)

Kermit A. Sande, Atty. Gen., Pierre, for plaintiff and respondent.

Mark V. Meierhenry, Rosebud, for defendant and appellant.

DOYLE, Justice.

The defendant was charged with a sixth offense of the crime of driving while under the influence of alcoholic liquor in violation of SDC 1960 Supp. 44.9922, now partly codified in SDCL 32-23-1 through 32-23-5. Defendant petitioned the Circuit Court of Tripp County for a writ of habeas corpus, contending his imprisonment to be illegal in that he is an enrolled member of the Rosebud Sioux Tribe and the offense of which he is charged was committed within "Indian Country" and, thus, the State of South Dakota has no jurisdiction over the defendant for the state offense as charged.

The writ of habeas corpus was denied by the circuit court, which held that the State of South Dakota has jurisdiction over Indian persons who violate state laws in Tripp County. From this decision the defendant appeals.

This case raises the single question of whether that portion of the Rosebud Indian Reservation situated in Tripp County was terminated and disestablished from the reservation by the Act of March 2, 1907, 34 Stat. 1230, Ch. 2536 (Act of 1907).

The parties agree that the State of South Dakota would not have jurisdiction over the defendant for the offense charged if these lands are "Indian Country" as defined in 18 U.S.C.A. §

1151, and this question depends upon whether the lands retained reservation status after the passage of the Act of 1907.

The same question was presented to the United States District Court in *Rosebud Sioux Tribe v. Kneip*, 1974, D.C.S.D., 375 F.Supp. 1065, wherein the Rosebud Tribe brought a declaratory judgment action seeking declaration that three acts of Congress did not diminish the Rosebud Reservation. We are concerned in this case with one of these three congressional acts, namely, the Act of 1907, which deals with Tripp County where the offense in this case took place. The United States District Court held that the Act of 1907 did disestablish that portion of the Rosebud Reservation containing Tripp County. On appeal to the United States Court of Appeals for the Eighth Circuit, the decision was affirmed, 521 F.2d 87.

Each case must be considered on the basis of the individual treaty or act of Congress relating to that particular reservation and all circumstances pertaining thereto.

The most recent guidelines regarding interpretation of acts of Congress concerning Indian Reservation lands were stated in *DeCoteau v. District County Court for Tenth Jud. Dist.*, 1975, 420 U.S. 425, 95 S.Ct. 1082, 1092-93, 43 L.Ed.2d 300 wherein it said:

> "This Court does not lightly conclude that an Indian reservation has been terminated. '[W]hen Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress.' *United States v. Celestine*, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195. The congressional intent must be clear, to overcome 'the general rule that "[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." ' *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, at 174, 93 S.Ct. 1257 at 1263, 36 L.Ed.2d 129, quoting *Carpenter v. Shaw*, 280 U.S. 363, at 367, 50 S.Ct. 121 at 122, 74 L.Ed. 478. Accordingly, the Court requires that the 'congressional determination to termin-

ate . . . be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history.' *Mattz v. Arnett,* 412 U.S. [481], at 505, 93 S.Ct. [2245], at 2258 [37 L.Ed.2d 92]. See also *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed. 2d 346, and *United States v. Nice,* 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192. In particular, we have stressed that reservation status may survive the mere opening of a reservation to settlement, even when the moneys paid for the land by the settlers are placed in trust by the Government for the Indians' benefit. *Mattz v. Arnett, supra,* and *Seymour v. Superintendent, supra."*

In accordance with these guidelines, we have reviewed all of the material presented concerning the Act of 1907, the documents of the time, the legislative history and the surrounding circumstances in order to determine the intent of Congress in passing the Act of 1907.

In *Rosebud Sioux Tribe v. Kneip, supra,* after considerable discussion about the Act of 1904 (Gregory County), the Eighth Circuit Court of Appeals stated:

"These materials concerning the description of the tract affected by the 1907 Act not only provide a contemporaneous and authoritative construction of the 1904 Act which supports our interpretation thereof, but also directly indicate, in light of the continuity discussed above, that the 1907 Act was similarly intended to further constrict the boundaries of the Rosebud Reservation.

"This intent was given firm expression by Congressman Burke during the House debate, whose remarks are unambiguous:

They will have left, after this land is disposed of, a reservation that is substantially fifty miles square * * * [85]

---

[85] 41 Cong.Rec. 3104 (1907). Todd and Mellette Counties make up a generally square area, roughly fifty miles on a side.

"The allotment provisions of the 1907 Act are asserted by the Tribe to support its position against disestablishment. The 1907 Act, provided, with respect to allotments, as follows:

> That prior to the said proclamation the Secretary of the Interior, in his discretion, may permit Indians who have an allotment within the Rosebud Reservation to relinquish such allotment and to receive in lieu thereof an allotment anywhere within said reservation * * *.

1907 Act § 2, 34 Stat. 1230.

"The Tribe argues that the provision respecting allotments· 'anywhere within said reservation,' which then included Tripp County, clearly negates a congressional intent 'to dissolve the reservation status of the Tripp County portion of the reservation' since, it argues, had dissolution been intended, Congress 'hardly would have provided for 160 acre allotments anywhere on the reservation, including Tripp County.'

"The argument stems from a misinterpretation of the legislative history. Inspector McLaughlin's letter of instructions from the Commissioner of Indian Affairs stated that:

> · The Office is in receipt of a communication of November 22 from Hon. Charles H. Burke, wherein he says that he recently visited the Rosebud Reservation for the purpose of gaining information with a view to preparing a bill for the sale of that part of the reservation located in Tripp County; that he found that a large number of Indians had taken allotments in the western and southwestern parts of the reserve, on lands which are now, and always will be, worthless, being nothing but sandhills; that the Indians who have allotments in the reservation elsewhere than in Tripp County should be permitted, in the discretion of the Secretary of the Interior, to relinquish them and to take allotments in lieu thereof in· some other part of the reservation, including Tripp County * * *.[86]

---

[86]    Letter from F. E. Leupp, Commissioner of Indian Affairs, to Inspector James McLaughlin, December 5, 1906 at 4, 3 App., at 169.

"The Inspector, in negotiating with the Indians, accordingly informed them of their rights to reallotment anywhere on the reservation,[87] and the specific mention of Tripp County in this connection was to remedy, 'before the opening of Tripp County,' the prior taking of poor land. There is no negation here of congressional intent to disestablish. The entire tenor of the negotiations and the contemporary documents are consistent with a congressional intent to extinguish the reservation status of the County rather than the contrary.

"After careful review we conclude that the language, legislative history and circumstances surrounding the passage of the 1907 Act, like the 1904 Act, clearly indicate a congressional determination to terminate the reservation in the counties affected by the Act.[88]

On the basis of this decision and the congressional history quoted therein, as well as the further circumstance that the State of South Dakota has exercised criminal and civil jurisdiction over

---

[87] [INSPECTOR McLAUGHLIN:] 8th. You ask that those entitled to allotments, but have not yet taken them be allotted, of which there are about 80 in all. In answer to that I will say there will be no difficulty in that. All beneficiaries of the reservation who have not yet received allotments can be allotted before Tripp County is opened to settlement, and they can take them anywhere on the reservation, including Tripp County. There will be a provision in the agreement to that effect.

9th. You desire that applications now pending before the Indian Office, asking to be permitted to change present location of allotments be acted on before the opening of Tripp County. I can promise to incorporate that provision in the agreement, and you people will be fully protected in that. As I previously stated, it would doubtless take a couple of years to bring about the opening of Tripp County. These allotments are what would delay it. We will incorporate in the agreement a provision that Tripp County shall not be opened until all the children born up to the ratification of the agreement, who have not received allotments, shall be allotted 160 acres each. These two items are already covered by the Burke Bill, which provides for relinquishments and reallotments and allotment to children, and giving the right to take such allotments in Tripp County.

*Proceedings of a Council held at Rosebud Agency, S. D. with the Indians of the Rosebud Reservation, December 14, 1906* at 17-18, 3 App. at 192-93.

[88] Subsequent enactments by the Congress itself provide an authoritative contemporary construction of the 1907 Act which supports this conclusion."

the unallotted lands in Tripp County for the past 65 years with the full acquiescence of all responsible federal authorities, we can see no justification requiring that the status be altered at this late date. We conclude that the Act of 1907 did disestablish that portion of the Rosebud Reservation containing Tripp County; therefore, the State of South Dakota has jurisdiction to prosecute the defendant in Tripp County for the offense charged.

In *State v. Molash,* 86 S.D. 558, 199 N.W.2d 591, we found that the Standing Rock Reservation was not disestablished by the Act of 1913 (37 Stat. 675). This Act is strikingly similar to the Act of 1907 herein involved in this case. Both Acts use the language "to sell or dispose of all that portion of (naming the reservation)" and go on to describe a contiguous tract of land on those reservations. Both Acts provide for the land to be sold and the money derived therefrom to be held in trust for the Indians, and for the allotment of lands to each Indian who has not been allotted before the sale was made. It should be noted that at the time this court decided *State v. Molash, supra,* we did not have the benefit of the comprehensive citations leading to an analysis of the "legislative history" and "surrounding circumstances" from which the intent of Congress could be established when it passed the Act dealing with the Standing Rock Reservation. Thus the case was decided on the wording of the 1913 treaty as interpreted in *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, and *City of New Town, North Dakota v. United States,* 8 Cir., 454 F.2d 121. *Rosebud Sioux Tribe v. Kneip, supra,* disposed of the Seymour and New Town cases in the following language:

"Cases where the congressional intent 'was that the reservation should continue to exist as such,' *Seymour, supra,* p. 355, or *New Town, supra,* where the court was unable to find a congressional intent to disestablish are not, of course, inconsistent with the result we have reached. For (as will be fully developed herein), the defendants before us have demonstrated that a congressional determination to terminate lay behind each of the Acts in question."

We also suggested in *State v. Molash, supra,* that certiorari be requested to determine the question therein presented.

Whether *State v. Molash, supra,* can withstand the scrutiny of the intent expressed by Congress at that time or the circumstances surrounding the enactment of the Act of 1913 remains for future decisions.

Affirmed.

All the Justices concur.